# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

GRANVILLE WILLIAM SMITH, IV,

Plaintiff,

v.

B. AUBUCHON, et al.,

Defendants.

No.  2:14-CV-0775-KJM-DMC-P

FINDINGS AND RECCOMMENDATIONS

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court is defendants' motion for summary judgement.  See ECF No. 129.

## I. PLAINTIFF'S ALLEGATIONS

This action proceeds on plaintiff's fourth amended complaint. See ECF No. 75. On January 4, 2011 plaintiff was engaged in a chase with two police officers, defendants Aubuchon and James, who suspected plaintiff of having conducted an armed bank robbery earlier that day. Plaintiff was peddling on a bicycle while the officers followed on motorcycles. According to plaintiff, at some point officer James rode up alongside plaintiff and shoved him on the shoulder, causing plaintiff to fall headfirst over his bicycle. As he attempted to orient himself, plaintiff noticed that James was pointing a taser-gun at him while Aubuchon pointed a firearm. After this,

James yelled, "taser, taser, taser" and fired the taser-gun into plaintiff's back. The taser-gun shot out barbs that attached to plaintiff's body and electrocuted him. Plaintiff collapsed to the ground and the officers continued to point their weapons at him. According to plaintiff, he was not being aggressive with the arresting officers and would have easily submitted to being handcuffed without being struck by the taser-gun. As a result of this incident, plaintiff claims to suffer from excruciating pain throughout his body and requires the use of an inhaler.

## II. PROCEDURAL HISTORY

On March 26, 2014, plaintiff filed his original civil rights complaint against defendants. ECF No. 1. On March 21, 2017, the Court dismissed plaintiff's complaint with leave to amend. ECF No. 55. Multiple amended complaints and motions to dismiss followed. On June 1, 2018, plaintiff filed his fourth amended complaint, ECF No. 75, which carries forth this current action. Plaintiff's fourth amended complaint made out three claims against the defendants: (1) deliberate indifference to medical needs; (2) failure to intervene; and (3) excessive force. Id.

On July 12, 2018, defendants submitted a motion to dismiss plaintiff's fourth amended complaint. ECF No. 78. On August 21, 2018, this Court issued Findings and Recommendations to the District Judge. ECF No. 81. On January 25, 2019, the District Judge adopted in part and rejected in part this Court's Findings and Recommendations. ECF No. 95. The District Judge ruled as follows: defendants' motion to dismiss was granted only as to the failure to intervene claim. Id. Following the District Judge's order, the fourth amended complaint survives on two claims: (1) medical indifference against defendants Aubuchon and James, and (2) excessive force against defendants Aubuchon and James. Id.

Regarding plaintiff's medical indifference claims, the District Judge held:

. . . The fourth amended complaint states:

Tasered on the spinal column, upper left top and bottom right of the spinal. Pain was ex-cruciating – causing life long pain in spinal, both shoulder and aching in both knees, needle sharp pains in bottom and both feet, using an inhaler.

2

> Once I was injured by taser, no one was called to treat my injuries. Created by M. James deploying his taser on me. So when no medical treatment rendered on me, and no ambulance called; no hospital help of what M. James did to me, and his confidant B. Aubuchon. It has been hours/days before I received medically examination of my injuries. But only to just be taken to jail.

ECF No. 75 at 3–4 (verbatim transcription). Based on these allegations, plaintiff has addressed the concerns raised by prior court orders. In light of the liberal pleading standards under Rule 12(b)(6), these allegations are sufficient to state a cognizable claim for indifference to plaintiff's medical needs. *See Lolli v. Cty. of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) (citation omitted) ("[O]fficials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment."). Therefore, because plaintiff has met the "facial plausibility" standard required to survive a motion to dismiss under 12(b)(6), *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), his claim for medical indifference as to defendants James and Aubuchon survives.

ECF No. 95, pgs. 2-3.

Regarding plaintiff's excessive force claim against defendant Aubuchon, the District Judge held:

> The facts alleged to implicate Aubuchon for excessive force are these: "(Aubuchon) held me at gun point"; "Aubuchon was looking at me face-to-face and there was with him his gun (handgun) gun pointed at me"; "Aubuchon by having his real gun pointed at me: Excessive force was because of that time B. Aubuchon could've instructed M. James to just walk up on me and just hand-cuff me"; "Aubuchon having me at gun point eliminated me any movement at all." ECF No. 75 at 3 (verbatim transcriptions). . . .
> The Ninth Circuit has explicitly stated, "We have held that the pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury." *Tekle v.United States*, 511 F.3d 839, 845 (9th Cir. 2007); *see also Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013) (officers' early morning raid of plaintiff's residence with guns drawn may support a finding of excessive force). Whether an officer is justified in brandishing his weapon depends on his reasonable assessment of the danger at the scene. *Robinson v. Solano Cty*., 278 F.3d 1007, 1015 (9th Cir. 2002). At this stage of the litigation plaintiff's pleading that Aubuchon's act of standing by with gun drawn while plaintiff lay incapacitated from tasing is sufficient to survive dismissal.
> Defendants argue, in the alternative, even if the court finds plaintiff has adequately pled Aubuchon administered excessive force, Aubuchon is entitled to qualified immunity. ECF No. 78-1 at 5. Qualified immunity is analyzed through a two-prong test: (1) whether defendant's conduct violated a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308

(2015) (citation omitted). In making such a determination, the court must view the facts "in the light most favorable to the party assessing the injury." *Katz*, 533 U.S. at 201. ``In viewing the facts as alleged most favorably to plaintiff, the court finds that qualified immunity does not warrant dismissal of plaintiff's excessive force claim. While it may be that Aubuchon was justified in brandishing his firearm at the onset of the altercation, the point at which he continued to point his gun as plaintiff lay prone from the taser strike calls into question whether any reasonable officer would understand he was not infringing upon plaintiff's constitutional right at that moment. Given that plaintiff's claim need only be "plausibly suggestive," *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009), the court finds that qualified immunity does not preclude plaintiff's excessive force claim against Aubuchon at this stage.

ECF No. 95, pgs. 4-5.

As to plaintiff's excessive force claim against defendant James, defendants never argued that the operative fourth amended complaint failed to state such a claim and the District Judge has concluded it does. See ECF No. 95, pg. 6.

The Court now considers defendants' motion for summary judgement, ECF No. 129, plaintiff's opposition, ECF No. 132, and defendants' reply, ECF No. 136.


### III. THE PARTIES' EVIDENCE

A.     **Defendants' Evidence**

Defendants James and Aubuchon's motion for summary judgement is supported by their statement of undisputed material facts (UMF), ECF No. 129-3, as well as the declarations of Glen A. Williams, ECF No. 129-4, and Marcus James, ECF No. 129-5. According to defendants, the following facts are undisputed:

1.     At approximately 10:00 a.m. on the morning of January 4, 2011, Plaintiff smoked a joint of marijuana and snorted a two- or three-inch line of methamphetamine.

Evidence: Plaintiff's Deposition, Exhibit 1 to Declaration of Glen Williams ("P. Depo"), 70:9-71:14.

2.     At approximately 2:30 p.m. on January 4, 2011, Plaintiff robbed First Bank at 2880 Sunrise Boulevard in Rancho Cordova.

Evidence: P. Depo, 6:19-7:25; Declaration of Marcus James ("James Decl."), ¶ 6; RJN, Exhs. 3 and 4.

///

4

3. Plaintiff then went to Cruz's Mexican Restaurant ("Cruz's") at 11255 Sunrise Gold Circle in Rancho Cordova.

Evidence: P. Depo, 23:18-24:19; James Decl., ¶ 10, Exh. 1.

4. At approximately 2:30 p.m., Officers Aubuchon and James were on patrol in that vicinity when dispatch radioed there had been a 211 (robbery) at First Bank, which on that date was located at 2880 Sunrise Boulevard in Rancho Cordova.

Evidence: James Decl., ¶ 6, Exh. 1 and 2.

5. Dispatch described the suspect as a black male in his late 20s, height 5'6", weight 150, long dreadlocks over his eyes, striped suit jacket with large stripes, matching grey suit pants, with a big gun tucked into his jacket.

Evidence: James Decl., ¶ 9, Exh. 2.

6. Dispatch indicated he had departed on foot toward Sunrise Boulevard and was last seen heading northbound.

Evidence: Id.

7. James drove through the area and could see a customer inside Cruz's Mexican Restaurant, later identified as Plaintiff, who was a black male roughly matching the age, height, and weight description of the suspect; however, he did not have dreadlocks but had hair pulled back in a ponytail, and he was wearing a dark puffy jacket rather than a striped suit jacket.

Evidence: James Decl., ¶ 10.

8. Soon after, Aubuchon and James stopped their marked police motorcycles in the parking lot outside the restaurant.

Evidence: James Decl., ¶ 11-12.

9. When Plaintiff exited the restaurant with his food in a bag and picked up his bicycle, Aubuchon noted that his pants were striped gray suit pants matching the suspect description, so the defendants asked Plaintiff to stop and speak with them.

Evidence: James Decl., ¶ 11-12; P Depo 23:18-24:19, 35:1-15.

10. Plaintiff does not recall them saying anything to him, but he was on his cell phone, talking with his girlfriend.

Evidence: P Depo, 35:16-36:7.

11. When he did not respond, Aubuchon used his Public Address system to loudly ask Plaintiff to speak with us.

Evidence: James Decl., ¶ 12.

12.     Plaintiff still did not respond, got his bicycle, walked it away from the officers towards the street over a grassy knoll, climbed onto his bicycle once he got to the sidewalk, and rode away.

Evidence: James Decl., ¶ 12; P Depo, 36:8- 37:8, 39:1-41:6, see Exhibit 5 to P Depo.

13.     Officers Aubuchon and James proceeded to ride their motorcycles down the grassy knoll onto the street to follow Plaintiff and caught up with him.

Evidence: James Decl., ¶ 12; P Depo 41:17- 20.

14.     James drove his motorcycle in the far right lane of Sunrise right alongside Plaintiff riding his bicycle on the sidewalk and loudly asked Plaintiff to stop and talk to them.

Evidence: James Decl., ¶ 13; P Depo, 41:17-21, 43:3-14.

15.     Plaintiff continued to pedal his bicycle quickly further up the sidewalk along Sunrise, crossing the roadway at the intersection of Citrus Road and back onto the sidewalk on the other side, tossed his lunch food away and kept riding.

Evidence: James Decl., ¶ 13; P Depo, 41:21-24, 44:15-21.

16.     Then, James caught up with Plaintiff again and asked Plaintiff to talk to them a second time, but Plaintiff did not comply and kept riding.

Evidence: James Decl., ¶ 13; P Depo 41:21- 42:2, 45:16-5.

17.     When Plaintiff did not heed the officer's second instruction to stop and speak with them, Officer James reached out his right hand and pushed Plaintiff who fell off his bicycle in a grassy area covered with leaves.

Evidence: James Decl., ¶ 14-16; P Depo, 44:15-47:20, 45:16-5, Exhibit 5 to P Depo.

18.     Aubuchon and James parked their motorcycles in the nearby Chevron parking lot, dismounted, and positioned themselves approximately ten feet away from Plaintiff at different angles to prevent him from fleeing further.

Evidence: James Decl., ¶ 16; P Depo 54:13- 56:8.

19.     After falling off his bicycle, Plaintiff regained his balance and stood up.

Evidence: James Decl., ¶ 18; P Depo, 47:21-23, 49:2-9.

///

///

20.     Officer Aubuchon had his handgun drawn, directed at Plaintiff, and was instructing Plaintiff to get on the ground.

Evidence: James Decl., ¶ 17; P Depo 54:13- 56:8.

21.     Officer James had his Taser drawn, directed at Plaintiff, and was instructing Plaintiff to get on the ground.

Evidence: James Decl., ¶ 17; P Depo 54:13- 56:8, 60:17-22

22.     Plaintiff's back was facing James, who could not see his face, front side, or hands, much less whether or where he may have been carrying the large gun the suspect was reported to be carrying.

Evidence: James Decl., ¶ 18.

23.     Plaintiff was standing on his feet and was attempting to look for or reach for something on the ground.

Evidence: James Decl., ¶ 18; P Depo, 49:2- 9.

24.     Plaintiff did not respond to or obey repeated instructions from Defendants to get on the ground, so James shouted "Taser, Taser, Taser" and, on the third "Taser," triggered his Taser to deploy its prongs toward Plaintiff's back.

Evidence: James Decl., ¶ 19; P Depo 49:10- 23.

25.     At this time, Plaintiff was wearing a baggy, puffy blue jacket with rows of squared cotton-filled puffs, over a t-shirt.

Evidence: James Decl., ¶ 10; P Depo 50:19- 22, 51:11- 53:10.

26.     Because of his big puffy jacket, James was unsure if the prongs would attach or if the Taser deployment would be effective, but they attached to his jacket in the middle center-right and lower left areas of his back.

Evidence: James Decl., ¶ 19; P Depo 62:9- 12, 63:20-25, 64:10-65:6.

27.     Plaintiff fell to the ground on top of his hands, heard an officer say "Let me see your hands," and lost consciousness.

Evidence: James Decl., ¶ 19; P Depo, 25:15-23, 72:22- 73:9.

28.     Plaintiff recalls regaining consciousness later inside an officer's car before being transferred to a detective's office, and has no memory of anything after he fell from the Taser deployment until regaining consciousness.

Evidence: P Depo, 25:2-26:5, 27:8-14, 72:22-73:9.

7

29.     After Plaintiff regained consciousness in the car, he did not talk until he was taken to a detective's office.

Evidence: P Depo, 34:5-23.

30.     From the point Plaintiff regained consciousness in the car, he never saw, spoke with, or interacted with Defendants James or Aubuchon again.

Evidence: P Depo, 25:15-26:5, 27:8-14.

31.     When Plaintiff fell to the ground from James' Taser deployment, Officer Aubuchon holstered his firearm and he and Officer Baldwin, who by this time had arrived on scene, proceeded towards Plaintiff to handcuff him.

Evidence: James Decl., ¶ 18, 20.

32.     James maintained his Taser trigger pull for a few seconds longer so they could safely approach because the officers could not see Plaintiff's hands, he was reported to have a large gun, and he had already tried to flee.

Evidence: James Decl., ¶ 20.

33.     In total, James' Taser was activated for not less than five seconds but not more than twelve seconds.

Evidence: Id.

34.     Plaintiff does not know how long Officer James had engaged his Taser because he lost consciousness.

Evidence: P Depo, 73:10-74:22.

35.     Aubuchon handcuffed Plaintiff without further incident.

Evidence: James Decl., ¶ 20.

36.     Upon a search of Plaintiff's person, officers found a .38 Smith & Wesson revolver in a holster on his waistband.

Evidence: James Decl., ¶ 21; P Depo, 85:1-19.

37.     The officers radioed to dispatch at approximately 2:51 p.m. regarding the incident, and multiple other officers and vehicles proceeded to arrive at the scene, including Officer Kelly Smith who also parked her vehicle in the Chevron lot.

Evidence: James Decl., ¶ 21.

/ / /

/ / /

38.     Once the search of Plaintiff was complete, officers stood Plaintiff up off the ground.

Evidence: James Decl., ¶ 22.

39.     As Plaintiff was stood up, the Taser prongs fell out onto the ground.

Evidence: <u>Id.</u>

40.     It is SSD and RCPD practice that Taser prongs should only be removed by medical personnel or by a trained officer; however, because the prongs fell out on their own, no such personnel were required to attend to Plaintiff.

Evidence: <u>Id.</u>

41.     Plaintiff was then walked to the Chevron lot and eventually placed into Smith's vehicle, which is where Plaintiff recalls returning to consciousness.

Evidence: James Decl., ¶ 23; P Depo, 25:2- 26:5, 27:8-14, 34:5-23, 72:22-73:9.

42.     James and Aubuchon did not see Plaintiff after he was walked away from the location he was handcuffed and had no further interaction with him; as traffic officers, they had little else in terms of duties or involvement in his case.

Evidence: James Decl., ¶ 23-24.

43.     Following the incident, James and Aubuchon proceeded to the station to prepare James' narrative supplemental report on the incident January 4, 2011.

Evidence: James Decl., ¶ 26, Exhibit 3.

44.     They then proceeded to return to their duties as traffic officers on patrol.

Evidence: James Decl., ¶ 27.

45.     At no time from the time James first encountered Plaintiff at Cruz's to the last time Defendants saw him as he was placed into Smith's vehicle did Plaintiff ever say, indicate, or give Defendants any reason to believe that Plaintiff was hurt or injured, or in any way required medical attention.

Evidence: James Decl., ¶ 25.

46.     Plaintiff did not exhibit any visible indications of any physical injuries from either his fall off his bicycle or from the Taser.

Evidence: James Decl., ¶ 25; P Depo, 75:1-9.

47. During the intake processing at the County Jail that evening, Plaintiff received medical attention from a nurse, who applied Band- Aids to the Taser prong entry points on his back and assured that he was medically cleared prior to being booked into the jail or housed.

Evidence: P Depo, 66:15-67:19.

48. This jail staff nurse was the first medical professional who examined or treated Plaintiff after being detained.

Evidence: P Depo, 69:1-6.

49. Prior to that time, however, Plaintiff did not tell anyone that he wanted or needed medical attention.

Evidence: P Depo, 69:7-20.

50. After being treated by the nurse during intake, Plaintiff did not seek any other medical treatment relating to the Taser wounds.

Evidence: P Depo, 77:1-9.

51. Plaintiff is currently a prisoner residing at Deuel Vocational Institution, having pled no contest to two counts of bank robbery (California Penal Code section 211), on January 29, 2014.

Evidence: P Depo, 6:19-7:25; Request for Judicial Notice ("RJN") Nos. 3 and 4, Exhs. 3 and 4.

52. When arrested, he was caught with a firearm.

Evidence: James Decl., ¶ 21; P Depo 8:1-4; RJN No. 4, Exh. 4.

53. With two previous felony convictions and the firearm enhancement, Plaintiff was sentenced to 22 years in prison on February 28, 2014, with an anticipated release date in 2029.

Evidence: P Depo, 9:10-10:5; RJN Nos. 3- 5, Exhs. 3-5.

54. Plaintiff was housed at Sacramento County jail/holding facilities until March 13, 2014, when he was transferred to and admitted as a state prisoner into Deuel Vocational Institution.

Evidence: RJN No. 5, Exh. 5.

///

///

///

///

///

10

## B.     Plaintiff's Evidence

Plaintiff's opposition to defendants' motion for summary judgement is supported solely by the following responses[1] to defendants' statement of undisputed facts:

Statements 1-11, 12, 15, 16, 18, 22, 24, 27, 28, 30, 31, 32, 35, 36, 40, 48.

Plaintiff's Response:   Undisputed.

12.     Disputed. Plaintiff was not aware he had to comply with a random request by law enforcement to stop and talk to them. As a citizen, plaintiff has the right to refuse to speak to law enforcement.

14.     Disputed. Plaintiff did not stop because there was no indication he was required to. There were no flashing lights or sirens going off at the time.

17.     Disputed. Plaintiff did not stop because he had a right to refuse to speak to the police. Again, there were no sirens or flashing indication that plaintiff was required to stop.

19.     Disputed. Plaintiff did not fall off his bicycle, he was pushed off. Plaintiff went head first over the handlebars and landed in some palm tree leaves.

20.     Disputed. Plaintiff's memory after falling over his handlebars is hazy but he remembers looking for his cell phone in the grass and officer Aubuchon pointing his gun at plaintiff.

21.     Disputed. Defendant James did not instruct plaintiff to get down on the ground. All plaintiff can recall is that James yelled "taser, taser, taser" and that the taser barbs struck plaintiff's back. While plaintiff was on the ground, he also recalls James yelling "let me see your hands."

23.     Disputed. After plaintiff flipped over his handlebars, he got up off the ground and searched for his cell phone.

25.     Disputed. The Sacramento County Sherriff's Department's records do not mention a "big puffy jacket."

26.     Disputed. Plaintiff's knowledge of defendants' statements and evidence is limited to what was disclosed to plaintiff at his deposition.

29.     Disputed. Plaintiff was unconscious. Despite defendants' training, neither of them performed any medical care for plaintiff before placing him inside officer Smith's vehicle.

33.     Disputed. Defendants' claim that the taser was deployed for 5-12 seconds was a later fabrication meant to benefit defendants.

---

[1]     Plaintiff's opposition contains multiple spelling errors. The following are summaries of plaintiff's responses as best understood by the court.

34.     Disputed. Plaintiff is only aware that defendants stated that they deployed the taser for an untimely amount of time. The 5-12 second range was a later statement made by defendants.

37.     Disputed. To the extent defendants dispatched for additional personnel, they did not request medical assistance for plaintiff.

38.     Disputed. Plaintiff was searched and then uncuffed to allow for the removal of his "puffy blue jacket", after which his black belt was removed from his waist.

39.     Disputed. The taser prongs came out when defendants ripped plaintiff's jacked off of his body.

41.     Disputed. Plaintiff did not walk anywhere and was unconscious until he was placed into Smith's vehicle.

42.     Disputed. Defendants disregarded plaintiff's well-being in violation of the Fourteenth Amendment.

43.     Disputed. Plaintiff only ever received Officer James' supplemental report.

44.     Disputed. Irrelevant.

45.     Disputed. Plaintiff suffered from the 1200-volt charge of the taser and lost consciousness.

46.     Disputed. Plaintiff was clearly injured after being pushed off of his bike, falling head first over the handless bars, and then being struck by a taser gun.

47.     Disputed. Plaintiff was not medically sound. Hours after being examined by a nurse, plaintiff suffered an asthma attack. Plaintiff was not cleared for general population at prison and was instead sent to the east detox housing floor.

49.     Disputed. Plaintiff was unconscious and unable to communicate. None of the officers called in a medical professional to examine plaintiff.

50.     Disputed. Plaintiff suffered from an asthma attack the following morning and was subsequently treated.

51-54.  Disputed. Irrelevant.

ECF No. 132., pgs. 75-87.

///

///

///

# IV. STANDARD FOR SUMMARY JUDGEMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

## V.  DISCUSSION

In their motion for summary judgement argument, defendants argue: (1) plaintiff's claims are barred by the statute of limitations; (2) even if they were not time-barred, plaintiff's claims do not establish a genuine dispute as to either his excessive force claims or medical indifference claims; and (3) even if plaintiff did establish a genuine dispute, defendants are entitled to qualified immunity as to both of plaintiff's claims. The Court finds: (1) plaintiff's claims are barred by the statute of limitations; (2) plaintiff presents a genuine dispute as to his excessive force claims; (3) plaintiff does not present a genuine dispute as to his medical indifference claims; and (4) in any event, defendants are entitled to qualified immunity.

///

///

14

## A.    <u>Statute of Limitations</u>

Defendants argue that plaintiff's claims fail as a matter of law because they are time-barred. The Court agrees.

"A federal claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." <u>Bagley v. CMC Real Estate Corp.</u>, 923 F.2d 758, 760 (9th Cir. 1991). § 1983 contains no specific statute of limitation, thus federal courts should borrow state statutes of limitations for personal injury actions in § 1983 suits. <u>See</u> <u>Wallace v. Kato</u>, 549 U.D. 384, 387 (2007). "The statute of limitations applicable to an action pursuant to 42 U.S.C. § 1983 is the personal injury statute of limitations of the state in which the cause of action arose." <u>Douglas v. Noelle</u>, 567 F.3d 1103, 1109 (9th Cir. 2009). California's statute of limitations for personal injury actions requires that the claim be filed within two years. Cal. Code Civ. Proc. § 335.1. In actions where the federal court borrows the state statute of limitation, the court should also borrow all applicable provisions for tolling the limitations period found in state law. <u>See Hardin v. Straub</u>, 490 U.S. 536, 539 (1989). California Civil Procedure Code § 352.1(a) provides that when a plaintiff is "imprisoned on a criminal charge" for "a term less than life" at the time a claim accrues, the statute of limitations is statutorily tolled during the time of his imprisonment for up to two more years. <u>See</u> Cal. Civ. Proc. Code § 352.1(a). However, the California Appellate Court has held that a pretrial detainee in custody is not "imprisoned on a criminal charge." <u>See</u> <u>Austin v. Medicis</u>, 21 Cal. App. 5th 577, 597 (2018). State law also governs the application of equitable tolling. <u>See</u> <u>Gress v. Smith</u>, No. 2:13-cv-0328 TLN KJN P, 2016 U.S. Dist. LEXIS 8949, at *9 (E.D. Cal. Jan. 26, 2016). However, the plaintiff has the burden to plead facts which would give rise to equitable tolling. <u>Hinton v. Pacific Enterprises</u>, 5 F.3d 391, 396 (9th Cir. 1993).

///

///

///

///

///

Defendants argue that plaintiff's complaint was filed more than a year after the statute of limitations had run. Specifically:

> Each of Plaintiff's claims, for both excessive force and medical indifference, accrued on the date of the incident, January 4, 2011, when he knew or had reason to know of the injury that is the basis for the claims for relief. <u>Kimes v. Stone</u>, 84 F.3d 1121, 1128 (9th Cir. 1996). The two-year limitations period would have expired on January 4, 2013. Plaintiff's complaint was not filed until March 26, 2014. (RJN No. 1, Exh. 1: Complaint.) Therefore, his complaint and its claims contained therein were untimely and thus time-barred.

ECF No. 129-2, pg. 13.

Defendants also argue that plaintiff is not entitled to tolling. Specifically:

> . . .Section 352.1 provides that the statute of limitations is statutorily tolled for up to two years when a plaintiff is "imprisoned on a criminal charge . . . for a term less than for life" at the time a claim accrues. Cal. Civ. Proc. Code § 352.1(a). However, being arrested or being a pretrial detainee in a county jail is not the equivalent of being imprisoned for a term of years. <u>Austin v. Medicis</u>, 21 Cal. App. 5th 577, 597 (2018) [. . .]
>
> * * *
>
> Here, Plaintiff pled no contest to his charges on January 29, 2014, was sentenced to his 22-year prison term on February 28, 2014, and was transferred to and admitted into Deuel Vocational Institute as a state prisoner on March 13, 2014 – each event well-over a year after his statute of limitations ran on January 4, 2013. Thus, prisoner tolling does not apply, and Plaintiff's March 26, 2014 Complaint was untimely.

ECF No. 129-2, pgs. 13-14.

As defendants note, plaintiff's claim accrued on the date he became aware of his injuries, i.e. the date of the incident, January 4, 2011, and the two-year limitations period expired on January 4, 2013. Thus, without tolling, plaintiff's original complaint, filed on March 26, 2014, is untimely. Defendants also argue that plaintiff's claims are not entitled to tolling because he was not "imprisoned on a criminal charge" such that relevant tolling statutes do not apply. The record clearly demonstrates that plaintiff was sentenced on February 28, 2014, such that he was a pretrial detainee throughout the limitations period and Cal. Civ. Proc. Code § 352.1 should not apply. <u>See</u> ECF No. 129-6, pg. 38.

///

///

Since it appears that defendants have demonstrated that plaintiff's action against them is untimely, the burden now rests on plaintiff to counter defendants' claims. However, plaintiff offers no evidentiary support for the assertion that his complaint was filed before the limitations period expired, or that he is entitled to tolling under any statutory provision. See ECF No. 132, generally. Also, plaintiff presents no argument demonstrating that he is entitled to equitable tolling. Id. In his opposition, plaintiff states, vaguely, that the late filing date was ". . . no fault of my own, I kept filing the first complaint over and over until the first clerk finally filed it." ECF No. 132, pg. 126. However, plaintiff does not explain what the underlying cause of the delay was nor why he should be granted equitable tolling. Therefore, the Court finds that plaintiff's claims are barred by the statute of limitations and defendants' motion for summary judgement should be granted.

**B.** **Excessive Force Claims**

Assuming plaintiff's claims are not all time-barred, the Court finds that plaintiff has made out a valid claim against both defendants for excessive force under the Fourth Amendment.

The Fourth Amendment requires that police officers use only "objectively reasonable" force "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). To determine whether an officer's use of force was reasonable, courts must balance the "nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake." Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007) (internal quotations and citations omitted). This balancing act requires courts to "assess the quantum of force used" and then "measure the governmental interests at stake" by considering the following three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (internal quotations and citations omitted).

///

///

Of these three factors, the most important is whether the suspect posed an immediate threat to the safety of the officers or others at the time force was applied. Graham, 490 U.S. at 396. The Graham factors, however, are not the only factors. George v. Morris, 736 F.3d 829, 837-38 (9th Cir. 2013). In fact, courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.'" Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (quoting Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 1994)). For instance, courts may look at "the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." Glenn v. Washington Cnty., 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

Defendants argue that plaintiff's excessive force claim fails as to both defendants Aubuchon and James because, given the circumstances, their use of force was reasonable. Defendants point out the following in their statement of undisputed material facts: (1) that they were searching for a suspect who was described as "a black male in his late 20s, height 5'6", weight 150, long dreadlocks over his eyes, striped suit jacket with large stripes, matching grey suit pants, with a big gun tucked into his jacket", UMF 5; (2) that they eventually came upon plaintiff, who roughly matched the suspect's description, UMF 7; (3) that upon further inspection, plaintiff's clothes matched the suspect's description, UMD 9;  (4) that they asked plaintiff to stop and talk to them but plaintiff rode away in his bicycle, ignoring their repeated requests, UMF's 10-16; (5) that, in order to stop plaintiff, officer James pushed plaintiff off of his bike and onto the ground, UMF 17; (6) that, after falling, plaintiff attempted to stand up, UMF 19; (7) that officer Aubuchon had his handgun drawn, directed at plaintiff, and was instructing plaintiff to get on the ground, UMF 20; (8) that officer James had his taser drawn, directed at plaintiff, and was instructing plaintiff to get on the ground, UMF 21; (9) that plaintiff's back was facing James, who could not see his (plaintiff's) face, front side, or hands, or whether or where he (plaintiff) may have been carrying the large gun the suspect was reported to be carrying, UMF 22; (10) that plaintiff did not respond to or obey repeated instructions from defendants to get on the ground, so

18

James shouted "Taser, Taser, Taser" and, on the third "Taser," triggered his taser to deploy its prongs toward plaintiff's back, UMF 24; and (11) that after the arrest, plaintiff was found to be in possession of a firearm in his waistband as suspected, UMF 36.

In response, plaintiff objects to defendants' contention that their use of force was reasonable. According to plaintiff, officer Aubuchon used excessive force by pointing his gun at him was while plaintiff was knocked off his bicycle. See ECF No. 132, pg. 25. Plaintiff also argues that James (1) shoved plaintiff off of his bicycle and then (2) tasered plaintiff with 1200 volts for five to twelve seconds while still disoriented, violating his constitutional rights. Id. at pgs. 25, 31.

Notwithstanding defendants' contention that any reasonable officer would use the amount of force the defendants employed in apprehending plaintiff, the Court disagrees, and finds that there is a genuine dispute as to the reasonableness of the defendants' conduct. At the time of the incident, the arresting officers suspected plaintiff of possessing a firearm and James noted that he saw plaintiff reaching for "something". UMF 22-23. While this testimony is strong, it is not unequivocal such that a reasonable trier of fact could not find that the officers' use of force was excessive given the circumstances. As mentioned in their statement of undisputed facts, the officers recognized that plaintiff was off-balance after falling off of his bicycle and thus not an immediate threat. Also, officer James could not see plaintiff's front, and did not know if plaintiff was in fact reaching for a weapon when he used his taser on plaintiff. The arresting officers only realized plaintiff was armed after completing the arrest. Also, while the defendants justify their use of force partly on the grounds that plaintiff matched a description of the armed suspect, they nonetheless deemed it safe enough to ride up alongside plaintiff as he was peddling his bicycle down the street. Viewing these facts in a light most favorable to the non-moving party plaintiff, it is not beyond dispute that defendants' actions could be considered unreasonable. See Estate of Elkins v. Pelayo, 737 F. App'x 830, 832 (9th Cir. 2018) (summary judgement denied; "[a] jury should be allowed to determine how much weight to give th[e] evidence [of arresting officer testimony that they shot a suspect because they thought he was reaching for a gun in his waistband].)

Thus, there exists a triable issue as to the appropriateness of the force used by defendants, and assuming arguendo the action had been timely filed, the defendants would not be entitled to relief from plaintiff's excessive force claims.

**C.      Medical Indifference Claims**

Defendants also argue that plaintiff's Fourteenth Amendment claim for deliberate indifference to medical needs against officers Aubuchon or James fails as a matter of law. In the event plaintiff's claims are not considered time-barred, there exists a genuine dispute as to whether defendants were deliberately indifferent to plaintiff's medical needs.

"Claims of failure to provide care for serious medical needs, when brought by a detainee [] who has been neither charged nor convicted of a crime, are analyzed under the substantive due process clause of the Fourteenth Amendment." Lolli v. County of Orange, 351 F.3d 410 (9th Cir. 2003); see also Gibson v. Cty. of Washoe, Nev., 290 F.3d 1175, 1187 (9th Cir. 2002) (reversed on other grounds). However, "the due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs.'" Gibson, 290 F.3d at 1187 (quoting Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir.1996)). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).

Although disputed within the Ninth Circuit, this Court has held that a claim of deliberate indifference to a pretrial detainee's medical needs is analyzed under an objective standard[2]. Scalia v. Cty. of Kern, 308 F. Supp. 3d 1064, 1076 (E.D. Cal. 2018). Under this

---

[2]      It is currently disputed in the Ninth Circuit whether a pretrial detainee's claim for deliberate indifference to medical needs is analyzed under a subjective or objective standard. See Borges v. City of Eureka, No. 15-cv-00846-YGR, 2017 U.S. Dist. LEXIS 10721, at *26 (N.D. Cal. Jan. 25, 2017) (objective standard); see also Sandoval v. Cty. of San Diego, No. 3:16-cv-01004-BEN-AGS, 2018 U.S. Dist. LEXIS 19545, at *19 (S.D. Cal. Feb. 6, 2018) (subjective standard). However, considering that the Eastern District of California has chosen to employ an objective standard, this Court shall follow suit and similarly use an objective test for pretrial detainee medical indifference. See Scalia v. Cty. of Kern, 308 F. Supp. 3d 1064, 1076 (E.D. Cal. 2018).

objective standard, "[a] plaintiff must show (1) a serious medical need, (2) a purposeful act or failure to respond to a prisoner's pain or possible medical need, even though a reasonable defendant in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (3) harm caused by the indifference. The second prong requires an intent level 'more than negligence but less than subjective intent—something akin to reckless disregard.'" Id. (citing Castro v. Cty. of L.A., 833 F.3d 1060, 1071 (9th Cir. 2016)).

Here, defendants argue that (1) plaintiff's medical needs were not serious at the time, and (2) even if they were, defendants were not deliberately indifferent to plaintiff's medical needs.

### 1.      Serious Injury

As for the assertion that plaintiff's medical needs were not serious at the time of the incident, the defendants argue that:

> . . .[A]t no time from the time James first encountered Plaintiff at [the restaurant] to the last time Defendants saw him as he was placed into Smith's vehicle did Plaintiff ever say, indicate, or give Defendants any reason to believe that Plaintiff was hurt or injured, or in any way required medical attention. Plaintiff did not exhibit any visible indications of any physical injuries from either his fall off his bicycle or from the Taser. During the intake processing at the County Jail that evening, Plaintiff received medical attention from a nurse, who applied Band-Aids to the Taser prong entry points on his back and assured that he was medically cleared prior to being booked into the jail or housed. This jail staff nurse was the first medical professional who examined or treated Plaintiff after being detained. Prior to that time, however, Plaintiff did not tell anyone that he wanted or needed medical attention. Even after being treated by the nurse during intake, Plaintiff did not seek any other medical treatment relating to the Taser wounds. Plaintiff's alleged medical needs were clearly not serious enough for Plaintiff to ask anyone for medical assistance, so they cannot be serious enough for any acts or omissions by Defendants Aubuchon or James to constitute a deprivation of Plaintiff's constitutional rights.

> ECF No. 129-2, pg. 24.

/ / /

/ / /

In response plaintiff states in his opposition that:

> Plaintiff objects, neither officers are qualified doctors or professional medical [personnel]. Plaintiff states that no medical [personnel were called to] treat injuries, or even ask if there was after brief periods of time that plaintiff was in and out of [consciousness]. As a lay person plaintiff obviously should know if they were tasered all the time, the effects of 1200 volts would not cause any injuries. Defendants own admission that medical [personnel] is to be called. (See UMF page 7, UMF # 44).

ECF No. 132, pg. 33.

Here, the Court agrees with plaintiff. Despite asserting that plaintiff did not indicate he was injured, defendants acknowledge that, after being tasered, plaintiff lost consciousness. See UMF 34 ("plaintiff does not know how long Officer James had engaged his Taser because he lost consciousness."). A reasonable jury could conclude that plaintiff suffered severe injury after being tasered but was unable to communicate it because he was unconscious. Additionally, defendants do not dispute plaintiff's claim that he suffers from excruciating pain throughout his body and requires the use of an inhaler as a result of the arrest. ECF No. 75, pg. 3. Therefore, a reasonable jury could also conclude that plaintiff's alleged injuries were sufficiently serious to amount to a constitutional violation.

### 2. Deliberate Indifference

Defendants claim that, notwithstanding the foregoing, plaintiff has failed to demonstrate any genuine dispute as to whether defendants were deliberately indifferent to his medical needs. In their motion to dismiss, defendants argue that:

> Even if Plaintiff's medical needs were serious, Defendants Aubuchon and James were not deliberately indifferent to his needs. Subjectively, Defendants were not aware he had any medical needs: James' Taser's prongs fell out on their own and did not require trained personnel to remove them, and Plaintiff was then taken into custody by other officers and placed into Officer Smith's vehicle. Defendants never saw any physical indication or manifestation of physical injuries that would require medical attention, and within a matter of minutes from James' Taser deployment, patrol officers had taken custody of Plaintiff from the Defendants, who were only Traffic Officers who had stumbled upon the fleeing suspect but who did not have the duty or authority to process Plaintiff's arrest and the subsequent investigation into his bank robberies. Objectively, a reasonable officer in the position of Defendants would have no reason to – nor opportunity to – make any decision, intentional or otherwise, with respect to the confinement of Plaintiff once

22

detained that placed Plaintiff in any risk of serious harm, much less any reason or opportunity to take measures to abate the risk. (See factors identified supra from Gordon, 888 F.3d, at 1125.)

ECF No. 129-2, pgs. 24-25.

In response, plaintiff states in his opposition that:

> Plaintiff's short period of time [when he] was with the defendants should have been taking as his most important if only they had just called for a professional medical person [to] clear him after being tasered. That is a SSD and RCPD practice that defendants admit [they are supposed to] follow. Instead defendants just discarded plaintiff to another officer and now [are] passing the blame onto [the] fellow officers. [. . .]

ECF No. 132, pg. 34.

Here, the Court also agrees with plaintiff. It is undisputed that (1) plaintiff was tasered to the point of unconsciousness, (2) defendants did not call for medical personnel to arrive at the scene, (3) defendants placed plaintiff into a separate patrol car and sent him off to the local police station for booking instead of a hospital, and (4) as a result, plaintiff now suffers from severe pain and requires the use of an inhaler. Given this, a reasonable jury could conclude that the plaintiff's unconscious state after being tasered should have alerted the officers that plaintiff was at risk of serious medical harm and needed immediate medical attention. Similarly, a trier of fact could decide that the officers' decision to not call medical personnel to the scene of an unconscious arrestee was deliberately indifferent. While defendants assert that "plaintiff did not exhibit any visible indications of any physical injuries from either his fall off his bicycle or from the [t]aser" (DUF 46), this position is entirely disputed by plaintiff. See ECF No. 132., pgs. 75-87. Since, at this stage, all reasonable inferences must be drawn in the non-moving party's favor, the Court finds this dispute to be genuine. Therefore, if the Court finds that plaintiff's action is not otherwise time-barred, plaintiff's medical indifference claim should proceed.

### D. Qualified Immunity

Defendants argue that, even if their conduct did in fact constitute excessive force, that they would be entitled to qualified immunity as to both of plaintiff's claims. The Court agrees.

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If a violation can be made out, the next step is to ask whether the right was clearly established. See id. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202 (citation omitted). Thus, the final step in the analysis is to determine whether a reasonable officer in similar circumstances would have thought his conduct violated the alleged right. See id. at 205.

When identifying the right allegedly violated, the court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than the factual circumstances surrounding the alleged violation. See Kelly v. Borg, 60 F.3d 664, 667 (9th Cir. 1995). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand [that] what [the official] is doing violates the right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987). Ordinarily, once the court concludes that a right was clearly established, an officer is not entitled to qualified immunity because a reasonably competent public official is charged with knowing the law governing his conduct. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). However, even if the plaintiff has alleged a violation of a clearly established right, the government official is entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see also Saucier, 533 U.S. at 205.

The first factors in the qualified immunity analysis involve purely legal questions. See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996). The third inquiry involves a legal determination based on a prior factual finding as to the reasonableness of the government official's conduct. See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995). The district court has discretion to determine which of the Saucier factors to analyze first. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. See Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

### 1. Excessive Force Claims

As discussed above, the Court finds that, taking all facts in a light most favorable to plaintiff, a reasonable trier of fact could determine that defendants used excessive force in subduing plaintiff. Therefore, the next steps in the Court's qualified immunity inquiry are to determine whether the violated right was clearly established and, if so, whether defendants could have mistakenly but reasonably believed their conduct was lawful. The Court considered each defendant in turn.

#### a. Defendant Aubuchon

In support for their contention that officer Aubuchon did not violate a clearly established right, the defendants state:

> In this case, the issue is whether a right to not have a gun pointed at an armed and fleeing suspect during an arrest was clearly established so that it would have been clear to a reasonable police officer that this type of conduct would be unlawful in the situation presented. It is plaintiff's burden to prove that the right allegedly violated was clearly established at the time of the challenged act. Davis v. Scherer, 468 U.S. 183, 197 (1984); Romero v. Kitsap, 931 F.2d 624, 627 (9th Cir. 1991). Plaintiff will be unable to cite any case that would have made it clear to Aubuchon that his act of detaining an armed bank robber who had been evading arrest at gunpoint was unlawful.
> Because there is no decisional authority that would have made it clear to Officer Aubuchon that his conduct was unlawful in the situation that he confronted, Officer Aubuchon is entitled to qualified immunity as to plaintiff's excessive force claim regarding his detention at gunpoint. Thus, Aubuchon is entitled to qualified immunity.

ECF No. 129-2, pg. 20.

In response, plaintiff's opposition states:

> Plaintiff object to Aubuchon detention [sic] it clearly shows
> that the Ninth Circuit stated, "the pointing a gun at someone may
> constitute excessive force, even if it does not cause physical
> injury." Thus, Aubuchon should not be given qualified immunity.

ECF No. 132, pg. 32.

The Court agrees with the defendants. It is initially the plaintiff's burden to allege a violation has been clearly established such that the officers should have been on notice. Luna v. Ridge, 436 F. Supp. 2d 1163, 1173 (S.D. Cal. 2006) ("[b]road generalities in the articulation of the constitutional right at issue . . . are insufficient to identify a clearly established right . . ."). "Except in the rare case of an 'obvious' instance of constitutional misconduct . . . [p]laintiffs must *identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment." Sharp v. Cty. of Orange, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original) (quoting White v. Pauly, 137 S.Ct. at 552). "In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful." Id. The preexisting law identified must also be "controlling—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a consensus of courts outside the relevant jurisdiction." Id. (internal citation and quotation omitted). "When the only cases a plaintiff cites are factually distinguishable, or provide 'nothing more than a general principle,' the public official is entitled to qualified immunity . . ." West v. City of Caldwell, 931 F.3d 978, 983, 985 (9th Cir. 2019) (quoting Emmons, 139 S. Ct. at 503-04)

Here, plaintiff's response in his opposition is simply a reiteration of his factual allegations. Plaintiff does not demonstrate that his being held at gunpoint by Aubuchon clearly amounts to a constitutional violation. Plaintiff does state that the Ninth Circuit has held that pointing a gun at someone may constitute excessive force, even if it does not cause injury. However, plaintiff does not explain what specific Ninth Circuit precedent he is referring to, nor does he explain how his particular circumstance is a *clear* violation of a constitutional right. At most, plaintiff highlights a general principle of the Ninth Circuit, which, as discussed above, is

insufficient.

The Court acknowledges that improperly holding a suspect at gunpoint has been recognized as unconstitutional in the Ninth Circuit. See Tekle v. United States, 511 F.3d 839, 845 (9th Cir. 2007). However, plaintiff does not attempt to analogize this broad principle to his particular situation. Such analysis is essential at the summary judgement stage as "[i]t is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 125 (2004). While there are times the Ninth Circuit has held that pointing a gun at a suspect may amount to a constitutional violation, it has also held in other instances that such force may also be reasonable. See Alexander v. Cty. of L.A., 64 F.3d 1315, 1320 (9th Cir. 1995) ("[i]t is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable.") Therefore, this action is not a "rare case of an 'obvious' instance of constitutional misconduct", such that plaintiff is not required to demonstrate a *clearly* established right. Sharp, 871 F.3d at 911. Since it is plaintiff's burden to demonstrate that a right is clearly established, and he has failed to do so here, defendant Aubuchon is entitled to qualified immunity.

b.  Defendant James

In support for their contention that officer James did not violate a clearly established right, the defendants state:

> [As to pushing plaintiff off of his bicycle,] [g]iven the existing law regarding the application of hands-on physical force in stopping an armed, fleeing felony suspect, a reasonable officer in Officer James' position would not have understood his use of force in pushing Plaintiff while fleeing on his bicycle to be clearly unlawful, in light of the fact that the Defendants were pursuing an bank robbery suspect actively evading arrest and refusing repeated, lawful instructions to stop, while wearing a holstered handgun on his waistband. Again, mere citation in the Complaint or 4AC to "excessive force by an officer," or even if he had cited the Fourth Amendment, falls well short of identifying a precedent that "squarely governs" the officer's conduct in the particular factual situation James confronted, and that places the unreasonableness of his action "beyond debate." Mullenix, 136 S. Ct. at 309; al-Kidd, 131 S. Ct. at 2083. Thus, when considering the totality of the circumstances, in light of the objective facts and circumstances that James confronted at the time,

27

James' measured use of a lower level of force – not even punching, kicking or even pushing Plaintiff onto the asphalt but rather into a vegetated field – was a reasonable choice, which clearly established law would not have informed James or any reasonable officer was unlawful.

Similarly, in the case of his second use of force – Tasing Plaintiff for between 5 and 12 seconds after Plaintiff had gotten back up from his bicycle fall and ignored lawful instructions to get on the ground – no reasonable officer could have known from any clearly established law that this action could be unlawful in the context of subduing an armed and fleeing suspect resistant to lawful instructions. At this time in early 2011, clearly established law provided that, in fact, a single Tasers shock used to subdue fleeing suspects was constitutional. See e.g. Mattos v. Agarano, 661 F.3d 433 (9th Cir. October 17, 2011); see generally Cockrell v. City of Cincinnati, 468 Fed. Appx. 491 (6th Cir. 2012) (unpublished) (collecting cases and concluding that as of 2009 courts had granted qualified immunity whenever "plaintiffs [were] tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers"); Abston v. City of Merced, 506 Fed. Appx. 650 (9th Cir. 2013) (it was not clearly established at the time of Abston's arrest in 2008 that use of four, five-second Taser cycles within a span of approximately two minutes against a suspect who appeared unarmed, fell to the ground following the first Tasing and thereafter presented no real threat of escape, and was surrounded by three officers, was objectively unreasonable); see Thomas v. Dillard, 818 F.3d 864 (9th Cir. 2015) (it was not clearly established in September 2010 that continuing to detain a noncompliant domestic violence suspect for the purpose of executing a frisk and tasing him when he refused to comply were unlawful). Based upon the clearly established law regarding the use of Tasers at the time of Plaintiff's encounter with James in 2011, no reasonable officer could have known that his deployment of his Taser in the circumstances established by the undisputed material facts would have been unconstitutional.

ECF No. 129-2, pgs. 21-22.

In response, plaintiff's opposition states that:

Plaintiff objects to giving immunity for the using [sic] of tasering plaintiff for 5 to 12 seconds with 1200 volts per second. Is [sic] a clear violation of plaintiff's rights.

By defendants [sic] own adminish [sic] of first using force by shoving plaintiff head first over handlebars of bicycle landing face first, plaintiff stood slightly disoriented looking around. Then was tasered, for untimely amount of time. Which later plaintiff claims injuries. (see 4AC).

ECF No. 132, pg. 31.

///

///

///

///

Importing the analysis laid out above, the Court finds that defendant James is also entitled to qualified immunity. Plaintiff does nothing more than merely recite the factual predicate of his complaint: that defendant James aggressively shoved plaintiff off of his bicycle onto the ground and then proceeded to taser plaintiff when he tried to "reach" for something (either his cell phone or a firearm). However, plaintiff does not offer any evidence or authority which demonstrates that this conduct violates a *clearly* established right. Since it is plaintiff's obligation to do so, and he has failed, defendant James is also entitled to qualified immunity as to plaintiff's excessive force claim.

2.     Medical Indifference Claims

In the event that the defendants' conduct did constitute medical indifference, they are nonetheless entitled to qualified immunity. As discussed above, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202. Here, again, plaintiff has failed to demonstrate that a violated right was clearly established. He simply reiterates the factual basis of his claim for medical indifference and states that his Fourteenth Amendment rights have been violated without providing further context. Since plaintiff has failed to satisfy his burden, defendants are also entitled to qualified immunity here.

///
///
///
///
///
///
///
///
///
///

## VI. CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Defendants' motion for summary judgement (ECF No. 129) be granted; and

2.      Judgement be entered in favor of defendants and against plaintiff on all claims as a matter of law.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the Court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 30, 2020

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE